1  Karin P. Beam, Esq. (Bar No. 112331)
   SPAULDING, McCULLOUGH & TANSIL LLP
2  90 South E Street, Suite 200
   Santa Rosa, CA  95404
3  Telephone: (707) 524-1900
   E-Mail:  beam@smlaw.com
4
5  Robert W. Payne, Esq. (Bar No. 73901)
   PAYNE IP LAW
6  111 N. Market Street, Suite 300
   San Jose, CA   95113
7  Telephone: (408) 981-4293
   E-Mail:  payne@bobpayne.com
8
9  Attorneys for Plaintiff
   TWiT, LLC and LEO LAPORTE
10
11              IN THE UNITED STATES DISTRICT COURT

12           FOR THE NORTHERN DISTRICT OF CALIFORNIA

13

14  TWiT, LLC, a Delaware limited liability      Case No.  18-cv-00341-JSC
    company, LEO LAPORTE,
15                                               **PLAINTIFFS' MEMORANDUM OF**
                                                 **POINTS AND AUTHORITIES IN**
16              Plaintiffs,                       **OPPOSITION TO DEFENDANT**
                                                 **TWITTER INC.'S  MOTION TO**
17        vs.                                    **DISMISS**

18  TWITTER, INC., a Delaware corporation,
                                                 Date:   May 24, 2018
19              Defendants.                       Time:  9:00 a.m.
                                                 Ctrm:  F, 15th Floor
20                                               Judge:  Honorable Jacqueline Scott Corley

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I. Introduction ...................................................................................................................1

   A.   A Plausible Recitation Of The Story. ........................................................................1

   B.   New Facts Presented By Twitter Miss The Point.....................................................3

      1.   The TWiT "Vine Video" Is Irrelevant, A Red Herring. ....................................3

      2.   The Eatlime Litigation Analysis Misses The Point, and Is Misleading. .........4

II. Legal Argument ...........................................................................................................5

   A.   Motions to Dismiss Are Disfavored So Long As Claims Are Plausible............................5

   B.   The Statutes of Limitation Arguments Cannot Stand; The Claims Accrued In 2017. ........6

   C.   The Contract Claims Are Sufficiently Pleaded, and Have Merit. ....................................7

      1.   The Pleading Requirements For Each Contract Claim Have Been Met. .......................7

      2.   The Contract Formation Elements Are Present.............................................8

      3.   Contract Interpretation Rules Argue In Favor Of TWiT's Claims................................8

      4.   The Agreement "Duration" Argument Is Not Tenable. ...................................9

      5.   Each Agreement Pleaded Was Supported By Consideration. ......................................10

      6.   Each Contract Claim Has Merit. ...................................................................11

          (a)   The Verbal Agreement in 2007. ........................................................11

          (b)   The Email Exchange in 2009. ...........................................................12

          (c)   The Implied Contract Is Properly Pleaded And Enforceable. ..................12

          (d)   Promissory Estoppel Is Properly Pled, And Plausible...........................13

   D.   The Fraud Claims Have Been Pleaded with Particularity. ...........................................15

   E.   The "Tort Claims" Are Properly Pleaded.........................................................16

   F.   The Trademark Claims Are Proper. .................................................................17

      1.   The "Incontestability" of Twitter's Mark Is No Defense To Infringement...................17

      2.   Twitter's Registration Does Not Cover the Use At Issue..............................................19

      3.   The Statue Of Limitation/Laches Arguments Fails .....................................................20

III. Conclusion ................................................................................................................20

i

1

# TABLE OF AUTHORITIES

2

## Cases

*Aceves v. U.S. Bank N.A.*
3    192 Cal.App.4th 218 (2011) ............................................................................ 14

4 *Advanced Choices, Inc. v. Dept. of Health Services*
   182 Cal.App.4th 1661 (2010) ........................................................................ 14
5

6 *Anderson News, L.L.C. v. American Media, Inc.*
   680 F.3d 162 (2nd Cir. 2012) .......................................................................... 6

7

8 *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*
   7 Cal.4th 503 (1994) ........................................................................................ 7

9 *Ashcroft v. Iqbal*
   556 U.S. 662 (2009) ......................................................................................... 6
10

11 *Barker v. Riverside County Office of Ed.*
   584 F.3d 821 (9th Cir. 2009) ........................................................................... 6

12

13 *Bell Atlantic Corp. v. Twombly*
   550 U.S. 544 (2007) ......................................................................................... 5

14 *Bentley v. Mountain*
   51 Cal.App.2d 95 (1942) .................................................................................. 7
15

16 *Berkley v. Dowds*
   152 Cal.App.4th 518 (2007) ............................................................................ 7

17

18 *Block v. eBay, Inc.*
   747 F.3d 1135 (9th Cir. 2014) ....................................................................... 15

19 *Brewer v. Horst & Lachmund Co.*
   127 Cal. 643 (1900) ....................................................................................... 12
20

21 *Broam v. Bogan*
   320 F.3d 1023 (9th Cir. 2003) ......................................................................... 5

22 *Butkus v. Downtown Athletic Club of Orlando, Inc.*
   2008 WL 2557427 (C.D. Cal. 2008) ............................................................ 18
23

24 *Cal. Cooler, Inc. v. Loretto Winery, Ltd.*
   774 F.2d 1451 (9th Cir.1985) ........................................................................ 18

25

26 *Careau & Co. v. Security Pac. Business Credit, Inc.*
   222 Cal.App.3d 1371 (1990) ........................................................................... 7

27 *Cervantes v. City of San Diego*
   5 F.3d 1273 (9th Cir. 1993) ............................................................................. 6
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Consolidated Theatres v. Theatrical Stage Employees Union, Local 16*
    69 Cal.2d 713 (1968) .................................................................................................... 10

*Construction Protective Services, Inc. v. TIG Specialty Ins. Co.*
    29 Cal.4th 189 (2002) .................................................................................................... 12

*Doe v. City of Los Angeles*
    42 Cal.4th 531 (2007) ...................................................................................................... 7

*Doe v. United States*
    419 F.3d 1058 (9th Cir. 2005) ........................................................................................ 6

*Dunham, Carrigan & Hayden Co. v. Thermoid Rubber Co.*
    84 Cal.App. 669 (1927) ................................................................................................. 12

*E-P Constructors Inc. v. Peterson Tractor Co.*
    192 Cal.App.2d 518 (1961) ........................................................................................... 10

*Foley v. Interactive Data Corp.*
    47 Cal.3d 654 (1988) ..................................................................................................... 13

*Furia v. Helm*
    111 Cal.App.4th 945 (2003) .......................................................................................... 16

*Garcia v. World Savings, FSB*
    183 Cal.App.4th 1031 (2010) ........................................................................................ 14

*Guzman v. Visalia Community Bank*
    71 Cal.App.4th 1370 (1999) ............................................................................................ 9

*Haggerty v. Warner*
    115 Cal.App.2d 468 (1953) ...................................................................................... 9, 10

*Hearn v. R.J. Reynolds Tobacco Co.*
    279 F.Supp.2d 1096 (D. AZ 2003) .................................................................................. 3

*International Audiotext Network, Inc. v. AT&T Co.*
    62 F.3d 69 (2nd Cir. 1995) .............................................................................................. 3

*Karl v. JeBien*
    231 Cal.App.2d 769 (1965) ........................................................................................... 12

*Kashmiri v. Regents of University of California*
    156 Cal.App.4th 809 (2008) .......................................................................................... 13

*Kerner v. Hughes Tool Co.*
    56 Cal.App.3d 924 (1976) ............................................................................................. 12

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS

*Keys v. Humana, Inc.*
  684 F.3d 605 (6th Cir. 2012) ........................................................................5

*Lazar v. Superior Court*
  12 Cal.4th 631 (1996) ..............................................................................16

*Lee Myles Associates Corp. v. Paul Rubke Enterprises, Inc.*
  557 F.Supp.2d 1134 (S.D. Cal. 2008) .......................................................17

*Levine v. Tobin*
  210 Cal.App.2d 67 (1962) ........................................................................10

*Long v. Authentic Athletix, LLC*
  2017 WL 6493094 (N.D.Cal. March 20, 2017) ........................................12

*Lopez v. Smith*
  203 F.3d 1122 (9th Cir. 2000) ...................................................................5

*MacDonald v. Rosenfeld*
  83 Cal.App.2d 221 (1948) ........................................................................10

*Marshak v. Treadwell*
  240 F.3d 184 (3d Cir. 2001) .....................................................................18

*McGlone v. Bell*
  681 F.3d 718 (6th Cir. 2012) .....................................................................5

*McIllmoil v. Frawley Motor Co.*
  190 Cal. 546 (1923) ..................................................................................11

*Mediacom Southeast LLC v. BellSouth Telecommunications, Inc.*
  672 F.3d 396 (6th Cir. 2012) .....................................................................3

*Miles v. Deutsche Bank National Trust Company*
  236 Cal.App.4th 394 (2015) .....................................................................12

*Miller v. Glenn Miller Productions, Inc.*
  454 F.3d 975 (9th Cir. 2006) ...................................................................18

*Orion Tire Corp. v. Goodyear Tire & Rubber Co., Inc.*
  268 F.3d 1133 (9th Cir. 2001) ...................................................................5

*Otworth v. Southern Pac. Transportation Co.*
  166 Cal.App.3d 452 (1985) ......................................................................12

*Pacific Corporate Group Holdings, LLC v. Keck*
  232 Cal.App.4th 294 (2014) ......................................................................8

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*
  469 U.S. 189 (1985) ............................................................................18, 19

*Pegram v. Herdrich*
  530 U.S. 211 (2000) ................................................................................... 5

*Peloza v. Capistrano Unified School Dist.*
  37 F.3d 517 (9th Cir. 1994) ........................................................................ 6

*Platt Pacific, Inc. v. Andelson*
  6 Cal.4th 307 (1993) ................................................................................. 14

*Quelimane Co., Inc. v. Stewart Title Guar. Co.*
  19 Cal.4th 26 (1998) ................................................................................. 17

*Raedeke v. Gibraltar Sav. & Loan Assn.*
  10 Cal.3d 665 (1974) ................................................................................ 14

*Ripani v. Liberty Loan Corp. of San Jose*
  95 Cal.App.3d 603 (1979) ......................................................................... 11

*Rivers v. Beadle*
  183 Cal.App.2d 691 (1960) ....................................................................... 11

*Robinson & Wilson, Inc. v. Stone*
  35 Cal.App.3d 396 (1973) ........................................................................... 9

*Robinson Helicopter Co., Inc. v. Dana Corp.*
  34 Cal.4th 979 (2004) ............................................................................... 16

*Russell v. Union Oil Co. of California*
  7 Cal.App.3d 110 (1970) ............................................................................. 8

*Service By Medallion, Inc. v. Clorox Co.*
  44 Cal.App.4th 1807 (1996) ...................................................................... 16

*Seth v. Lew Hing*
  125 Cal.App. 729 (1932). .......................................................................... 10

*Shell v. Darneille*
  162 Cal.App.3d 957 (1984) ....................................................................... 11

*Souza v. Westlands Water Dist.*
  135 Cal.App.4th 879 (2006) ...................................................................... 15

*Sovereign Military Hospitaller Order v. Florida Priory of the Knights Hospitallers*
  809 F.3d 1171 (11th Cir. 2015). ................................................................ 18

*Spiral Direct, Inc. v. Basic Sports Apparel, Inc.*
  151 F.Supp. 3d 1268 (M.D. Florida 2015) ................................................ 18

*Starr v. Baca*
  652 F.3d 1202 (9th Cir. 2011) .................................................................... 6

*Sterling v. Taylor*
  40 Cal.4th 757 (2007) ..................................................................................... 12

*Sunset-Sternau Food Co. v. Bonzi*
  60 Cal.2d 834 (1964) ...................................................................................... 11

*Sutherland v. Barclays American/Mortgage Corp*
  53 Cal.App.4th 299 (1997) .............................................................................. 14

*Tiffany & Co. v. Spreckels*
  202 Cal. 778 (1927) ........................................................................................ 10

*U.S. ex rel. Air Control Techs., Inc. v. Pre Con Indus., Inc.*
  720 F.3d 1174 (9th Cir. 2013) ........................................................................... 6

*West v. JP Morgan Chase Bank, N.A.*
  214 Cal.App.4th 780 (2013) ............................................................................ 15

*White Lighting Co. v. Wolfson*
  68 Cal.2d 336 (1968) ...................................................................................... 11

*Wine Packing Corp. of Calif. v. Voss*
  37 Cal.App.2d 528 (1940) ............................................................................... 10

*Wise v. Southern Pac. Co.*
  223 Cal.App.2d 50 (1963) ................................................................................. 7

*Wolf v. Price*
  244 Cal .App.2d 165 (1966) ............................................................................ 12

*Xechem, Inc. v. Bristol-Myers Squibb Co.*
  372 F3d 899 (7th Cir. 2004) .............................................................................. 6

*Zee Medical Distributor Association, Inc. v. Zee Medical, Inc.*
  80 Cal.App.4th 1 (2000) .................................................................................. 10

*Zurich General Accident & Liab. Assur. Co., Ltd. v. Industrial Accident Commission*
  132 Cal.App. 101 (1933) ................................................................................... 9

**Statutes**

15 U.S.C. §1057(c)(1) ........................................................................................ 18

15 U.S.C. §1064(3) ............................................................................................ 18

15 U.S.C. §1065 .......................................................................................... 17, 18

California Civil Code
  § 1620 ............................................................................................................ 12

  § 1621) ........................................................................................................... 13

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS

§1605 .................................................................................................................................. 10

§1624 (a)(1) ........................................................................................................................ 12

§3333 .................................................................................................................................. 16

California Code of Civil Procedure
   §457 ................................................................................................................................. 7

## Other Authorities

3 McCarthy on Trademarks and Unfair Competition §19:3 ....................................................... 18

Restatement 2d, Contracts §19 ................................................................................................... 13

Restatement 2d,  Contracts §30 .................................................................................................... 8

Restatement 2d, Contracts §71(3) .............................................................................................. 10

## Rules

Federal Rule of Civil Procedure
   Rule 12(b)(6) ...................................................................................................................... 5, 6, 7

I. <u>Introduction</u>

Stripped to its essence, the claim at hand is simple.  Based on their understanding that the names "TWiT" and "Twitter" were causing marketplace confusion, the companies agreed that TWiT and Leo Laporte would not sue Twitter for trademark infringement so long as Twitter refrained from streaming audio/video under the Twitter brand.  There would be no litigation pending had Twitter ventured into TWiT's domain under another name.

A.      A Plausible Recitation Of The Story.

In support of its Motion to Dismiss TWiT's Complaint, Twitter presents new facts allegedly pertinent to the claim analysis at bench, but most of the data is irrelevant.  A plausible reading of the material now before the Court allows the following recitation, markedly similar to the facts described in TWiT's initial pleading:

Since 2005, TWiT has been producing and publishing via the internet "television programs" under the trademark TWiT.  In 2007, Twitter's founder/creator Ev Williams ("Ev") appeared on a TWiT program to talk about his new microblogging service called Twitter.  TWiT's program host (plaintiff and license owner) Leo Laporte ("Leo") discussed with Ev the similarity between the names "TWiT" and "Twitter"; Leo told Ev that he had considered suing Twitter over the confusion.  Ev acknowledged that he "did worry about that", admitting the legal implications of the similarity in names.  A co-host of the program described the actual confusion of TWIT listeners regarding the names.  Later, a caller asked Ev whether Twitter planned to expand its services beyond microblogging, the use of text (rather than audio or video) to convey messages.  Ev told her that Twitter was in the business of text exchanges.  He noted the complexity any expansion of services would occasion, saying that Twitter was not then moving beyond its text- based services.  It might consider expansion, particularly "pictures from user cameras" if it could do so simply- but Twitter "was not there yet".  In response, Leo said "<u>Don't turn it into a blogging engine- it's what it is</u>."  Ev replied "<u>Yeah.  Text is really powerful.  It's not going away</u>."  Leo closed the discussion by saying "<u>I like it.  I like it</u>."

At the very least, the 2007 exchange confirms the market confusion between the two trademarks.  It confirms Ev's representation that at that point, Twitter was not moving beyond its

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS

140-character platform into the video streaming business.  Twitter "might expand at some point to allow users to post pictures".  The exchange also alerted Twitter to the fact that as long as it remained a text exchange platform ("Don't turn it into a blogging engine"), TWiT would not object ("I like the fact that text is not going away and that Twitter is not going to turn into a blogging engine.")  The exchange can be understood to mean that Leo advised Ev of legal concerns regarding brand confusion should Twitter turn into something more than what it was, with Ev replying "Yeah.  Text is not going away."

The allegations before the Court also confirm that TWiT obtained a Registration for its trademark the same month Ev appeared on Leo's program.  TWiT's mark is designated for direct entertainment by TWiT in the nature of visual and audio performances.  Twitter's registration came later, in 2009, and rather than direct use of the platform by Twitter, it contemplates use by third parties to share information, photos, videos, etc. about themselves.  This case is not about cat videos posted by third party users on a platform provided by Twitter.  TWiT is not seeking to interfere with third party users streaming video as part of their Twitter feed.  The case instead is focused on audio and video streaming "under the Twitter brand", a direct incursion by Twitter itself into TWiT's domain.

In 2009, two years after Ev's appearance on Leo's program, news stories described an expansion of Twitter's services into television programming akin to TWiT's broadcast platform. Leo immediately wrote to Ev, reminding him of their 2007 conversation addressing trademark confusion.  Leo told Ev that expansion by Twitter into audio or video content under the Twitter name would cause damage to TWiT, comprise "forward and reverse confusion", and "tread on TWiT's hard-earned trademark rights".  Leo told Ev that the TWiT and Twitter marks could continue to co-exist based on the difference in services provided under each brand.  But it was "critical", Leo wrote, that the boundaries discussed in 2007 be addressed again, given Twitter's apparent plan to expand "into a micro-blogging engine".  "(T)he use of the TWITTER mark for audio or video streaming is problematic for TWIT", Leo said, and "we don't want to have to use any formal legal means to protect our mark."  In response, Ev wrote "Don't worry.  We're not expanding to audio or video under the Twitter brand."

1    A plausible interpretation of the words exchanged by email in 2009 confirms that TWiT told

2    Twitter it could not use the Twitter mark to expand into TWiT's domain without legal action.  A

3    plausible interpretation of these words confirms that TWiT told Twitter that it would not file suit if

4    Twitter, under the Twitter mark, stayed away from TWiT's domain.  In exchange, Leo said, TWiT

5    would not sue Twitter for trademark violations.  A plausible, reasonable interpretation of Ev's

6    response confirms that Twitter accepted TWiT's terms.  Ev said "Don't worry" (about our potential

7    expansion into audio/ video streaming under the Twitter name, and the resulting damage to your

8    business and mark); <u>we aren't going to expand into audio or video streaming under the Twitter</u>

9    <u>brand</u>."  A plausible interpretation of this exchange is that "the deal was made".  For almost ten

10   years, until late 2017, Twitter adhered to the agreement, and so did TWiT.

11   B.    <u>New Facts Presented By Twitter Miss The Point.</u>

12       Twitter brings to Court several documents via its Request for Judicial Notice and as Exhibits

13   to the Declaration of attorney Joseph Gratz.  It primarily uses the new material to argue that the

14   statutes of limitation at issue began to run long before the timing addressed in the Complaint.  But

15   in order for Twitter to use new material to prevail at this stage of the litigation, it must be clear to

16   the Court that there exist "no material disputed issues of fact regarding the relevance of the

17   document."  *Mediacom Southeast LLC v. BellSouth Telecommunications, Inc*., 672 F.3d 396, 400

18   (6th Cir. 2012).  At this stage of the proceedings, any ambiguity presented by the documents must

19   be resolved in TWiT's favor.  *International Audiotext Network, Inc. v. AT&T Co*., 62 F.3d 69, 72

20   (2nd Cir. 1995); *Hearn v. R.J. Reynolds Tobacco Co*., 279 F.Supp.2d 1096, 1102 (D. AZ 2003).

21   TWiT submits that the documentary evidence presented by Twitter in its Motion to Dismiss does

22   not support Twitter's position.  At the very least, the new data demonstrates material disputed facts.

23       1.    <u>The TWiT "Vine Video" Is Irrelevant, A Red Herring.</u>

24       Twitter's Motion to Dismiss relies heavily on analysis of a video program streamed by

25   TWiT in 2013.  Declaration of Joseph G. Gratz, Ex. D.  During the program, Leo experimented

26   with a new software application known as Vine.  The Vine application enabled a third party user to

27   broadcast six-second videos out into the world.  But the Vine application was not an expansion into

28   video streaming by Twitter "under the Twitter brand".  Had it been, Leo would have written to Ev

1   once again.  Instead, and in pivotal contrast, "Vine" was six-second video streaming platform vastly

2   different from TWiT's television programming.  Instead, and in pivotal contrast, it was marketed

3   and sold by a different company with a different name, not "under the Twitter brand".

4          At best, the "Vine" analysis argued by Twitter demonstrates a material fact in dispute

5   regarding accrual of the claims at bench.  Was the Vine streaming "under the Twitter brand"?

6   TWiT says "no" and Twitter apparently disagrees.  The facts before the Court demonstrate that Leo

7   was clearly vigilant regarding the TWiT/Twitter co-existence agreement and conduct.  When he

8   became aware of a potential breach in 2009, he immediately wrote to Ev to clarify and confirm the

9   arrangement, threatening litigation over the trademarks.  Certainly, had Leo considered the Vine

10  application to be an encroachment by Twitter into TWiT's video streaming domain, he would have

11  written a second letter to Ev.  But Leo didn't write to Ev or go to court after the Vine demonstration

12  program, because the Vine application was not streaming "under the Twitter brand".

13         The "Vine" analysis confirms TWiT's position.  There is no claim at bench pertaining to

14  video streaming accomplished by Twitter under a different name.  The streaming under Twitter's

15  name did not arise until 2017, as pleaded by TWiT.  To the extent the new material presented by

16  Twitter creates ambiguity or a disputed material issue regarding accrual of TWiT's claims, the

17  Motion to Dismiss cannot stand.

18         2.      The Eatlime Litigation Analysis Misses The Point, and Is Misleading.

19         In a second effort to divert the Court's attention from the central issues at hand, Twitter

20  offers a Complaint filed in 2009 by TWiT against Eatlime, Inc., a Delaware Corporation.  Twitter's

21  Request to Take Judicial Notice, Ex. 4.  But the Eatlime pleading does not support Twitter's

22  argument that TWiT's claims accrued in 2009.  Yes, TWiT filed the Eatlime litigation, but it was

23  not litigation based on "video streamed by Twitter under the Twitter brand".  Instead, it was

24  litigation premised on video streamed by Eatlime using the TWiT brand.  As with the Vine

25  streaming analysis, above, the Eatlime case presents a foundational distinction with a difference.

26  Eatlime's streaming was not a breach of Ev's agreement "not to stream under the Twitter brand".  If

27  it had been, TWiT would have named Twitter as a defendant in that case.  The Eatlime analysis,

28  like Vine, presents a red herring, a comparison of apples to oranges.

In May 2017, Leo first learned of streaming <u>accomplished under Twitter's name</u>.  If Twitter were to announce today that it would offer audio and video streaming services under the brand Purple, or Green, or Platypus, the case at hand would be dropped.  The argument based on <u>Eatlime</u> misses the point, creating at best a disputed material fact that cannot now support dismissal of TWiT's claims.  The issue of claim accrual should be presented at trial herein.

## II. <u>Legal Argument</u>

Even in light of the additional "facts" produced by Twitter at this early stage of litigation, the analyses presented in its Motion to Dismiss are not persuasive.  Interpretation of TWiT's pleading under the applicable law demonstrates that TWiT presents claims that withstand scrutiny under Federal Rule of Civil Procedure 12(b)(6).  The Motion to Dismiss is not well-founded.

### A.   <u>Motions to Dismiss Are Disfavored So Long As Claims Are Plausible.</u>

Over the years, federal courts have viewed motions to dismiss under Rule 12(b)(6) with disfavor, based on the "secondary role" pleadings traditionally have played in the federal system as well as the liberal policy pertaining to their amendment.  *Broam v. Bogan,* 320 F.3d 1023, 1028 (9th Cir. 2003) (noting that a Rule 12(b)(6) dismissal with prejudice is proper only in "extraordinary" cases); *McGlone v. Bell* 681 F.3d 718, 728 (6th Cir. 2012).  In accord, papers opposing a Motion to Dismiss may clarify allegations whose meaning may be unclear; a plaintiff's analysis should be considered in determining whether to grant dismissal or leave to amend.  *Orion Tire Corp. v. Goodyear Tire & Rubber Co., Inc*., 268 F.3d 1133, 1137 (9th Cir. 2001); *Pegram v. Herdrich,* 530 U.S. 211, 230, fn. 10 (2000).  Most courts hold that leave to amend a pleading should be granted unless the pleading cannot possibly be cured.  *Lopez v. Smith* 203 F.3d 1122, 1130-1131 (9th Cir. 2000).

More recently, courts have analyzed efforts to dismiss litigation at the pleading stage through the lens of "plausibility".  *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556-557, 570 (2007).  Simply put, "[i]f a reasonable court can draw the necessary inference from the factual material stated in the complaint, the plausibility standard has been satisfied."  *Keys v. Humana, Inc*., 684 F.3d 605, 610 (6th Cir. 2012).  The court assumes the truth of the allegations made, draws on its "judicial experience and common sense", and determines whether a pleading alleges a plausible

1   claim. *Ashcroft v. Iqbal,* 556 U.S. 662 at 679 (2009).  At this stage of the litigation, too, the court

2   assumes that all general allegations asserted in the Complaint "embrace whatever specific facts

3   might be necessary to support them."  *Peloza v. Capistrano Unified School Dist.,* 37 F.3d 517, 521

4   (9th Cir. 1994).

5           Further, inferences drawn from factual allegations must be drawn "in the light most

6   favorable to plaintiff", so as to construe the complaint "liberally."  *Barker v. Riverside County*

7   *Office of Ed.,* 584 F.3d 821, 824 (9th Cir. 2009); *Doe v. United States,* 419 F.3d 1058, 1062 (9th

8   Cir. 2005).  When allegations made can support more than one inference, the court adopts the

9   inference supporting a valid claim, so that if facts present two plausible inferences, the issue cannot

10  be determined on a Rule 12(b)(6) motion.  *Starr v. Baca,* 652 F.3d 1202, 1216 (9th Cir. 2011);

11  *Anderson News, L.L.C. v. American Media, Inc.,* 680 F.3d 162, 185 (2nd Cir. 2012).  The

12  "plausibility" standard has been met in this case.

13  B.      The Statutes of Limitation Arguments Cannot Stand; The Claims Accrued In 2017.

14          In large part, Twitter bases its effort to dismiss TWiT's Complaint and each claim stated

15  therein on grounds not supported by the material it introduces via Judicial Notice and the

16  Declaration of Joseph C. Gratz.  Normally, a plaintiff is not required to anticipate a statute of

17  limitations defense in its complaint, and a claim may be dismissed as untimely pursuant to a

18  12(b)(6) motion "only when the running of the statute [of limitations] is apparent on the face of the

19  complaint." *U.S. ex rel. Air Control Techs., Inc. v. Pre Con Indus., Inc.,* 720 F.3d 1174, 1178 (9th

20  Cir. 2013); *Xechem, Inc. v. Bristol-Myers Squibb Co.* 372 F3d 899 (7th Cir. 2004).  Even if dates

21  named in the complaint fall beyond the statutory period, a Rule 12(b)(6) dismissal is not required,

22  and is granted "only if the assertions of the complaint, read with the required liberality, would not

23  permit the plaintiff to prove that the statute (had been) tolled."  *Cervantes v. City of San Diego,* 5

24  F.3d 1273, 1275 (9th Cir. 1993) (internal quotes omitted).

25          Here, Twitter argues that each claim brought by TWiT is too late, all based on its position

26  that the statutes of limitation began to run in 2013, when "Vine" was launched.  But determination

27  of the accrual of TWiT's claims is, at best, a disputed issue of material fact, even assuming judicial

28  notice of Twitter's "Vine" and "Eatlime" offerings.  Because neither streaming by Vine nor Eatlime

1    are pertinent to the case, as their streaming was "not under Twitter's brand", Twitter's statute of

2    limitations arguments are all focused on the wrong premise, misplaced, red herrings.  Viewed in the

3    light most favorable to TWiT, the facts pled lead to a plausible inference that TWiT's claims

4    accrued in 2017, when Twitter began streaming video "under the Twitter brand".  Given that no

5    statutes of limitation before the Court are shorter than two years, the pleading filed by TWiT merits

6    attention.  Based on the admonitions regarding interpretation of pleadings under a Rule 12(b)(6)

7    analysis, TWiT's claims are timely pled; its Complaint should not be dismissed.

8    C.    The Contract Claims Are Sufficiently Pleaded, and Have Merit.

9            1.    The Pleading Requirements For Each Contract Claim Have Been Met.

10           Twitter argues that the contract claims raised by TWiT are not soundly pleaded.  But the

11   essential elements of a contract claim, whether written, oral, implied, or by estoppel, are

12   demonstrated in TWiT's pleadings.  Agreements were made, conduct ensued, breaches have

13   occurred, and damages sustained.  A complaint (other than on sounding in fraud, as addressed

14   below) will be upheld if it provides the defendant with "notice of the issues sufficient to enable

15   preparation of a defense."  *Doe v. City of Los Angele*s, 42 Cal.4th 531, 549-550 (2007).  General

16   allegations of causation are sufficient, and satisfaction of contract conditions may also be pleaded

17   generally.  *Berkley v. Dowds,* 152 Cal.App.4th 518, 528 (2007); California Code of Civil

18   Procedure §457; *Careau & Co. v. Security Pac. Business Credit, Inc*., 222 Cal.App.3d 1371, 1390

19   (1990).  Allegations that a defendant breached an agreement are insufficient to state a claim unless,

20   as in the pleading at bench, the complaint describes factual information regarding the conduct

21   constituting the alleged breach.  *Bentley v. Mountain,* 51 Cal.App.2d 95, 98 (1942); *Wise v.*

22   *Southern Pac. Co*., 223 Cal.App.2d 50, 60 (1963) (disapproved on other grounds in *Applied Equip.*

23   *Corp. v. Litton Saudi Arabia Ltd*., 7 Cal.4th 503 (1994).

24           At paragraphs seven through twenty-nine of its Complaint, TWiT provides a detailed factual

25   basis for the claims brought against Twitter.  Each of the contract claims begins with a reallegation

26   paragraph incorporating those twenty-two paragraphs by reference, so that the facts pleaded are

27   present and under each of the claims raised by TWiT.  If the Court is concerned that the allegations

28   are not sufficiently specific, TWiT is prepared and able to amend accordingly.

1           2.      <u>The Contract Formation Elements Are Present.</u>

2          A plaintiff proves contract formation by demonstrating that (1) the terms were clear enough

3 for the parties to understand what each was required to do; (2) the parties agreed to give each other

4 something of value (a promise to do something or not to do something may have value); and (3) the

5 parties agreed to the terms of the contract.  Judicial Council of California Jury Instructions

6 ("CACI") 302.  CACI 302 also informs jurors that when they question formation of a contract, they

7 should ask themselves "if, under the circumstances, a reasonable person would conclude, from the

8 words and conduct of each party, that there was an agreement.  You may not consider the parties'

9 hidden intentions."

10          In order to plead an offer, TWiT must show communication of its willingness to enter into

11 an agreement with reasonably specific terms, so that Twitter could reasonably conclude that a

12 contract would be created if the offer is accepted.  CACI 307.  In turn, to plead an offer's

13 acceptance, TWiT must show that Twitter agreed to be bound by the terms of TWiT's offer, and

14 that Twitter communicated its agreement to TWiT.  CACI 309.  Acceptance of an offer can be

15 manifested by conduct as well as by words.  *Russell v. Union Oil Co. of California,* 7 Cal.App.3d

16 110, 114 (1970).

17           3.      <u>Contract Interpretation Rules Argue In Favor Of TWiT's Claims.</u>

18          With contract formation guidelines as background, the interpretation of an offer's

19 acceptance is a question of fact.  Citing to the Restatement 2d of Contracts, the court in *Pacific*

20 *Corporate Group Holdings, LLC v. Keck,* 232 Cal.App.4th 294, 311−312 (2014)  noted that

21 "frequently…, the offeror's language, if fairly interpreted, amounts merely to a statement of a

22 satisfactory method of acceptance, without positive requirement that this method shall be

23 followed."  In fact, according to *Pacific, supra*, and the Restatement 2d, section 30, "…an offer

24 invites acceptance in any manner and by any medium reasonable in the circumstances….  Language

25 referring to a particular mode of acceptance is often intended and understood as suggestion rather

26 than limitation; the suggested mode is then authorized, but other modes are not precluded."  Based

27 on the general rule that "manifested mutual assent" rather than "actual mental assent" is the

28 essential element in contract formation, the test of the true meaning of an acceptance is not what the

1    party making it thought it meant or intended it to mean.  Rather, the test is what "a reasonable

2    person in the position of the parties would have thought it meant." *Guzman v. Visalia Community*

3    *Bank,* 71 Cal.App.4th 1370, 1376–1377 (1999).  "[T]he mere state of mind of the parties… is not

4    the essential object of inquiry, the terms of the promise-act being determinable by an external and

5    not by an internal standard …." *Zurich General Accident & Liab. Assur. Co., Ltd. v. Industrial*

6    *Accident Commission,* 132 Cal.App. 101, 104 (1933).

7         Twitter argues against contract formation by interpreting the communications made during

8    the 2007 TWiT broadcast and the 2009 email exchange between Leo and Ev as nothing more than

9    mere "talk", each taken out of context and unenforceable.  But as above, it is not within the

10   province of the Court to base dismissal of litigation on communications susceptible to more than

11   one interpretation.  "Where the existence of a contract is at issue and the evidence is conflicting, or

12   can lead to more than one inference, it is for the trier of fact to determine whether a contract

13   existed." *Robinson & Wilson, Inc. v. Stone,* 35 Cal.App.3d 396, 407 (1973).

14         4.      The Agreement "Duration" Argument Is Not Tenable.

15         Twitter argues that no agreement was made with TWiT as no contract duration term was

16   ever specified by the parties.  First, the analysis ignores the central point made by both Leo and Ev

17   in their interactions.  " TWiT" and "Twitter" are in fact confusing tradenames.  But as long as they

18   co-existed in different worlds, that confusion would be palatable.  As long as they co-existed in

19   their difference worlds, TWiT would not sue Twitter.  The agreements at issue were intended to

20   avoid confusion caused by similar trademarks.  Trademark rights, of course, do not expire as long

21   as the trademark owner continues to use the mark in connection with the applicable goods or

22   services.  As a result, many trademark agreements, especially where the parties agree to coexist, do

23   not have a defined term, but continue until either party legally abandons its rights in the trademark.

24   This analysis, a fair and plausible interpretation of the exchanges and conduct at bench, provides a

25   "duration term" for the agreements under analysis.

26         Even so, the lack of a provision for duration does not make an agreement fatally uncertain.

27   If the nature of the contract and surrounding circumstances afford a reasonable basis for implying

28   the term, the courts are empowered to recognize that implied term. *Haggerty v. Warner,* 115

1   Cal.App.2d 468, 473 (1953); *Consolidated Theatres v. Theatrical Stage Employees Union, Local*

2   *16,* 69 Cal.2d 713, 725, 730 (1968).  Further, as in the case at hand, California courts long have

3   recognized that a contract may provide for a duration of indefinite length, without specific

4   limitation, "tied not to the calendar but to the conduct of the contracting parties".  *Zee Medical*

5   *Distributor Association, Inc. v. Zee Medical, Inc.*, 80 Cal.App.4th 1, 7 (2000).  Here, the duration of

6   the contract is based on the conduct of the parties and each party's rights in its respective

7   trademark.  So long as each party continues to use its mark in connection with its particularized

8   services, the agreement for co-existence continues.  So long as Twitter refrained from streaming

9   audio/video under the Twitter brand, TWiT will not sue.

10          5.      <u>Each Agreement Pleaded Was Supported By Consideration.</u>

11          Twitter also argues that no contract can be enforced against it due to an alleged failure of

12   consideration.  But consideration to support an agreement can be discerned in a myriad of ways, by

13   action, by forbearance, by a change in legal relations, by a promise.  (Restatement 2d, Contracts

14   §71(3); CACI No. 302.)  Consideration may be found via a benefit agreed to be conferred upon the

15   promisor, or a detriment suffered or agreed to be suffered by the promisee.  California Civil Code

16   §1605; *Seth v. Lew Hing,* 125 Cal.App. 729, 734 (1932).  The facts proffered by TWiT readily

17   support these analyses.

18          Specifically, forbearance to sue on a claim, as in this case, can constitute consideration for

19   an agreement; a promise to forbear may even be implied.  *Tiffany & Co. v. Spreckels,* 202 Cal. 778,

20   790 (1927); *Wine Packing Corp. of Calif. v. Voss,* 37 Cal.App.2d 528, 538 (1940); *MacDonald v.*

21   *Rosenfeld,* 83 Cal.App.2d 221, 237 (1948); *E-P Constructors Inc. v. Peterson Tractor Co.*, 192

22   Cal.App.2d 518, 524 (1961); *Levine v. Tobin*, 210 Cal.App.2d 67, 69 (1962).  Consideration was

23   exchanged by and between TWiT and Twitter according to a plausible reading and interpretation of

24   the exchanges and the conduct at issue.  That consideration, the forbearance by TWiT to refrain

25   from suing over the admittedly confusing trademarks, and Twitter's agreement to keep to its own

26   domain under the Twitter brand- is amply pled by TWiT.  Those respective positions, together with

27   the conduct in accord for almost ten years, demonstrate consideration for the contract claims raised

28

1   in this case.  Unless no plausible basis exists to support TWiT's claims, the Motion to Dismiss

2   cannot be granted.

3          6.        Each Contract Claim Has Merit.

4          As the contract claims analysis is undertaken, the language used by the parties is to

5   be interpreted liberally.  "…[T]he court must not hold the parties to some impossible, or ideal, or

6   unusual standard, but must take language as it is and people as they are."  *Rivers v. Beadle,* 183

7   Cal.App.2d 691, 695 (1960).  The law does not favor but "leans against the destruction of

8   contracts" based on uncertainty.  *McIllmoil v. Frawley Motor Co.,* 190 Cal. 546, 549 (1923).

9          (a)       The Verbal Agreement in 2007.

10          TWiT submits that a reasonable person in Leo's shoes would believe that Leo's "I thought

11   about suing you when you first showed up on the scene with a name just like ours, so don't expand

12   into a micro-blogging engine and compete directly with us because your trademark would be

13   confusing in that marketplace" and Ev's "I was worried about that" and "We're not even thinking

14   about adding photos yet" could plausibly lead to an inference of a co-existence agreement,

15   particularly as Twitter co-existed in accord with the agreement for ten years.  A reasonable person

16   in Leo's shoes would understand that his letter saying "Don't stream audio/video under the Twitter

17   name or I'll have to take legal action", together with Ev's "Don't worry, we won't stream under the

18   Twitter brand" would reasonably be interpreted to confirm an agreement that Twitter was not going

19   to stream audio/video under its own name.

20          But Twitter argues that the oral agreement made between TWiT and Twitter in 2007 is

21   unenforceable based on application of the statute of frauds doctrine.  Initially, commentators

22   "almost unanimously urge that considerations of policy indicate a restricted application of the

23   statute of frauds, if not its total abolition."  *Sunset-Sternau Food Co. v. Bonzi,*  60 Cal.2d 834, 838

24   (1964); *White Lighting Co. v. Wolfson,* 68 Cal.2d 336, 343 (1968); *Ripani v. Liberty Loan Corp. of*

25   *San Jose,* 95 Cal.App.3d 603, 610 (1979); *Shell v. Darneille,* 162 Cal.App.3d 957, 961 (1984).

26          In addition, even assuming Twitter has met its burden of showing that Leo and Ev's oral

27   understanding was not to be performed within a year, the inquiry does not end there.  When the

28   evidence includes a writing authored by "the party to be charged or by the party's agent", the

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS

1  doctrine is not implicated.  California Civil Code §1624 (a)(1).  In order to defeat application of the

2  statute of frauds, the writing need not contain all of an agreement's terms.  Ev's email response to

3  Leo's letter will allow TWiT's verbal contract claim to proceed if it "identifies the subject of the

4  parties' agreement, shows that they made a contract, and states the essential contract terms with

5  reasonable certainty."  *Sterling v. Taylor,* 40 Cal.4th 757, 766 (2007).  "Because the statute of

6  frauds merely serves an evidentiary purpose", in most instances "it is not even necessary that the

7  parties intended the memorandum to serve a contractual purpose."  *Long v. Authentic Athletix,*

8  *LLC,*, 2017 WL 6493094,  at *4 (N.D.Cal. March 20, 2017); *Sterling v. Taylor, supra*, at 766.

9      The memorandum made by the "party to be charged" (Ev's email sent to Leo) may be

10  informal, with an agreement consisting of separate documents each signed by one of the parties.

11  *Brewer v. Horst & Lachmund Co*., 127 Cal. 643, 646 (1900); *Dunham, Carrigan & Hayden Co. v.*

12  *Thermoid Rubber Co*., 84 Cal.App. 669, 673 (1927); *Karl v. JeBien,* 231 Cal.App.2d 769, 772

13  (1965); *Wolf v. Price* 244 Cal .App.2d 165, 171 (1966); *Kerner v. Hughes Tool Co*., 56 Cal.App.3d

14  924, 934 (1976).  Here, at this stage of the litigation, the correspondence sent by Ev to Leo saying

15  "Don't worry" serves as a writing sufficient to defeat the statute of frauds defense applicable to the

16  verbal agreement earlier made.

17              (a)       The Email Exchange in 2009.

18      If an action is based on an alleged breach of a written contract, a copy of the written

19  instrument can be attached and incorporated by reference to support the claim.  *Otworth v. Southern*

20  *Pac. Transportation Co*., 166 Cal.App.3d 452, 459 (1985).   Here, the correspondence between Leo

21  and Ev, attached as Exhibits B and C to TWiT's Complaint, constitutes an executed written contract

22  with the terms described therein.  In addition, TWiT is entitled to plead "the legal effect" of the

23  contract rather than its precise language.  *Miles v. Deutsche Bank National Trust Company,* 236

24  Cal.App.4th 394, 402 (2015); *Construction Protective Services, Inc. v. TIG Specialty Ins. Co*., 29

25  Cal.4th 189, 199 (2002).  Here, TWiT has done both.

26              (b)       The Implied Contract Is Properly Pleaded And Enforceable.

27      The terms of an express contract "are stated in words" (California Civil Code § 1620), while

28  the terms and the existence of an implied contract "are manifested by conduct" (California Civil

12

Code § 1621).  In order to parse the existence of an implied contract, courts analyze the reasonable expectation of the parties at the time of agreement.  To determine the reasonable expectation of the parties, the court examines "the totality of the circumstances.... 'Agreement may be shown by the acts and conduct of the parties, interpreted in the light of the subject matter and of the surrounding circumstances.'"  *Kashmiri v. Regents of University of California*, 156 Cal.App.4th 809, 832 (2008); citing *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 681 (1988).  Restatement 2d, Contracts §19, also emphasizes the point that consent may be manifested by conduct as well as words.  It may be shown "wholly or partly by written or spoken words or by other acts or by failure to act."  The question whether the parties' conduct creates an implied agreement is generally a question of fact.  *Foley, supra*, at 677.

In this case, whether the implied agreement began after the verbal exchange between Leo and Ev in 2007 or the written exchange two years later, Twitter's conduct plausibly demonstrates an understanding of the agreement it made with TWiT.  In fact, Twitter's offer of proof pertaining to its statutes of limitations argument, the Vine and Eatlime examples, plausibly demonstrates Twitter's decision to stream video (albeit not video like TWiT, or like it now is doing) under different names.  For ten years, knowing of the trademark confusion issue, Twitter did not stream video under the Twitter brand.  Had that conduct occurred in a vacuum, with no discussion between the two companies on the subject, the conduct may simply have been serendipitous.  But the conduct did not arise in a vacuum- Twitter knew of the market confusion that would ensue if it streamed audio/video in direct competition with TWiT under the name Twitter.  The question of whether the conduct of these parties from 2007 to 2017 created an implied agreement must be put to the jury.

(c)     Promissory Estoppel Is Properly Pled, And Plausible.

Twitter has not brought any new facts to Court to negate the promise made by Ev in his 2009 email to Leo.  Instead, Twitter strains to explain the promise by casting it in the light of a single television project that brought the issue to Leo's attention.  But the interpretation of Ev's promise, whether it related only to that single television reference or whether it was a broader promise, that Twitter would not ever invade TWiT's market under the Twitter brand, is a jury

1    question.  Twitter's interpretation of Ev's promise is not plausible, but if it has any effect at all

2    herein, it is to raise an issue of material fact in dispute.  Resolution of that dispute cannot happen

3    here- the jury must be called for that purpose.

4          To be enforceable, a promise must be definite enough for a court can determine the scope of

5    the duty undertaken, so that an assessment of damages can be made.  *Aceves v. U.S. Bank N.A*., 192

6    Cal.App.4th 218, 226 (2011), citing *Garcia v. World Savings, FSB,* 183 Cal.App.4th 1031, 1045

7    (2010).  Promissory estoppel also applies when a promise which TWiT should reasonably expect to

8    induce forbearance on the part of Twitter and "which does induce forbearance" would result in an

9    'injustice' if the promise were not enforced.... "  *Advanced Choices, Inc. v. Dept. of Health*

10   *Services,* 182 Cal.App.4th 1661, 1671–1672 (2010).

11         The doctrine of promissory estoppel is used to provide the element of consideration,

12   ordinarily required to create an enforceable promise.  The purpose of the doctrine is to make a

13   promise binding without consideration "in the usual sense of something bargained for and given in

14   exchange...." *Raedeke v. Gibraltar Sav. & Loan Assn*., 10 Cal.3d 665, 672 (1974).  Twitter is bound

15   by Ev's promise if Ev reasonably expected that TWiT would not take Twitter to court in reliance on

16   this promise- "Don't worry, we're not streaming audio/visual under the Twitter brand."  *Sutherland*

17   *v. Barclays American/Mortgage Corp,* 53 Cal.App.4th 299, 312, 61(1997); *Garcia v. World*

18   *Savings, FSB, supra*, 1039–1041.  The promise by one party and the detrimental reliance by another

19   operate as a substitute for consideration to the extent necessary "to prevent injustice."  *Platt Pacific,*

20   *Inc. v. Andelson,* 6 Cal.4th 307, 320-321 (1993).  Ev never told Leo to "take a leap".  When Leo

21   objected to Twitter's offending conduct, Ev instead confirmed that it would not be a problem for

22   TWiT, that Leo need not worry about a change in the use of the Twitter mark.

23         Finally, Twitter argues that the doctrine of promissory estoppel cannot support the facts pled

24   by TWiT because the "acceptance" language spoken by Ev, the "Don't worry- Twitter is not

25   expanding to streaming under the Twitter brand" language, is unenforceable as it speaks only to

26   Twitter's present activities at the time, rather than a promise to refrain from video streaming in the

27   future.  First, to the extent that TWiT's interpretation of Ev's language is plausible, Twitter's effort

28   must fail.  Second, Twitter's interpretation is implausible.  Why would Ev tell Leo not to worry if

1    he were planning to stream Twitter video the next day?  Why would Ev tell Leo he shouldn't worry

2    because Twitter wasn't going to do this particular television show, but that they were working on

3    one for release in three weeks?  As Leo's letter to Ev made clear, and as Ev already knew and

4    understood, the issue between the two companies wasn't _when_ Twitter would stream video- it was

5    _whether_ Twitter would stream audio/video under its own brand _at all._  The only rational

6    interpretation of Ev's remarks, given the marketplace confusion premise, is that Leo shouldn't

7    worry _because Twitter understood the problem._  Twitter was not going to invade TWiT's territory

8    at all.  And Twitter did not, for almost ten years.

9         Beyond the issue of implausibility, Twitter's analysis is legally unfounded.  In *Block v.*

10   *eBay, Inc.*, 747 F.3d 1135, 1138 (9th Cir. 2014), cited by Twitter in its moving papers, the language

11   at issue was more clearly an expression of present activity.  "We are not involved in the actual

12   transaction" was interpreted by the court not to contain promissory language.  But Ev's words are

13   different.  "Don't worry- Twitter is not expanding…" can readily be interpreted as a promise, a

14   reassurance, a clear signal that Leo did not have to go to court because Twitter was not going to

15   invade its territory _not just that day_, but in the future.  It would make no sense otherwise unless

16   Ev was engaged in intentional misrepresentation.  As the *Block* court noted, "If a contract is to be a

17   basis of liability for the [defendant]'s violation of [a rule] ... it must be a contract in which the

18   [defendant] promises to abide by [that rule]."  *Block, supra*, at 1138, citing *Souza v. Westlands*

19   *Water Dist.*, 135 Cal.App.4th 879, 892 (2006).  At best, Twitter has raised a triable issue of material

20   fact over whether Ev was making a promise to Leo or misleading him.

21   D.    The Fraud Claims Have Been Pleaded with Particularity.

22        Twitter argues that the fraud-based claims of False Promise, Intentional Misrepresentation,

23   and Negligent Misrepresentation, are not pleaded with particularity.  The requirement that fraud

24   claims must be pleaded with particularity serves two purposes: (i) to give notice to defendant with

25   such particularity that defendant can meet the charges; and (ii) to permit the dismissal of meritless

26   fraud claims on the basis of the pleadings.  *West v. JP Morgan Chase Bank, N.A.*, 214 Cal.App.4th

27   780, 793 (2013).  Twitter can readily discern the basis for these claims as currently pleaded, and

28

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS

1   dismissal would not be warranted even if the allegations are not clear enough, as TWiT is readily

2   able to clarify the language to assist Twitter in its defense.

3         TWiT has pleaded the misrepresentation.  Ev's email saying "Don't worry…" is clearly

4   before the Court.  Now that Twitter has provided background information from the show broadcast

5   in 2007, TWiT can amend to include Ev's words during that broadcast as well.  TWiT also

6   describes the conduct undertaken by Twitter, its restraint from streaming audio/video under the

7   Twitter brand for almost ten years.  The Complaint specifies that Ev intended Leo to rely on his

8   remarks and that Leo did rely on them by not filing litigation against Twitter earlier.  TWiT alleges

9   irreparable injury resulting from the conduct described in each of the fraud-based claims.

10        The particularity requirement applied to fraud claims requires that allegations "show how,

11  when, where, to whom, and by what means the representations were tendered." *Lazar v. Superior*

12  *Court,* 12 Cal.4th 631, 645 (1996); *Robinson Helicopter Co., Inc. v. Dana Corp*., 34 Cal.4th 979,

13  993 (2004).  TWiT also must plead the "detriment proximately caused" by Twitter's conduct

14  (California Civil Code §3333), allegations of damage suffered, and a causal connection with

15  TWiT's reliance on Twitter's representations.  *Service By Medallion, Inc. v. Clorox Co*., 44

16  Cal.App.4th 1807, 1818 (1996).  A fraud complaint is sufficient if it alleges the type of damage

17  suffered without specific dollar amounts.  *Furia v. Helm,* 111 Cal.App.4th 945, 956 (2003).  TWiT

18  has pleaded these facts.  To the extent the pleading is insufficiently clear and does not apprise

19  Twitter of the basis for the claims brought, TWiT is readily able to amend its pleading, if need be.

20  E.    The "Tort Claims" Are Properly Pleaded.

21        TWiT has pleaded claims sounding in Intentional and Negligent Interference with

22  Prospective Economic Advantage based on Twitter's offending use of its Twitter mark.  Twitter

23  argues that the claims fail due to the statutes of limitation, but, as above, they do not.  Twitter also

24  claims that the pleading standards required have not been met by TWiT; to the extent the Court

25  agrees, TWiT is readily able to further articulate its claims.   While it is true, however, that earlier

26  cases required specific factual pleadings for various non-fraud torts like those alleged by TWiT, the

27  California Supreme Court recently has held that fraud is the only remaining cause of action/claim

28  "in which specific pleading is required to enable the court to determine on the basis of the pleadings

1    alone whether a foundation existed for the charge .…" *Quelimane Co., Inc. v. Stewart Title Guar.*

2    *Co*., 19 Cal.4th 26, 46-47 (1998).

3         Against that backdrop, TWiT has pleaded that Twitter interfered with its prospective

4    economic advantage by separate wrongful conduct, as required, including its breach of contract, by

5    fraudulent conduct, and by trademark violations, among other wrongful conduct.  If that element of

6    the claims is not clear, TWiT will amend.

7         TWiT's Complaint also advises Twitter that its wrongful conduct has interfered with

8    TWiT's existing business relationships with its consumers and advertisers.  Complaint at ¶¶66, 80.

9    Under the holding of *Lee Myles Associates Corp. v. Paul Rubke Enterprises, Inc*., 557 F.Supp.2d

10   1134, 1140 (S.D. Cal. 2008), an allegation of "prospective economic relationships" does not

11   support a claim for interference with prospective economic advantage.  This cause of action

12   "protects the expectation the relationship will produce the desired benefit, not 'the more speculative

13   expectation that a potentially beneficial relationship will arise.'"  However, because the Complaint

14   in *Lee Myles* also alleged existing economic relationships, it was sufficient to state a claim.  Just as

15   in *Lee Myles*, TWiT has pleaded the interference element of these claims appropriately- Twitter

16   knowingly and negligently interfered with TWiT's prospective economic advantage based on

17   "existing customers and advertisers".

18        If any element of these claims is not clear, TWiT will amend.

19   F.   The Trademark Claims Are Proper.

20        1.   The "Incontestability" of Twitter's Mark Is No Defense To Infringement.

21        Twitter seeks to preclude the pending Trademark claims based on its assertion that its

22   trademark was registered in 2007, arguably "conclusive evidence" that Twitter can use its mark as it

23   will.  The analysis is problematic on several fronts.  First, section 1065 of the Lanham Act directly

24   addresses the issue raised by Twitter.  It specifically carves out an exception to the "incontestable"

25   argument, noting that "except to the extent, if any, to which the use of a mark registered on the

26   principal register infringes a valid right" in continuous use "from a date prior to the date of

27   registration", the registration becomes incontestable.  This limitation on an "incontestable"

28   registration is consistent with the rights granted under a registration.  Section 1057 expressly states

1    that a registration does not grant a right of priority against a company that used its mark prior to the

2    registration.  15 U.S.C. §1057(c)(1).

3          The issue was discussed in *Miller v. Glenn Miller Productions, Inc.,* 454 F.3d 975, 979 (9th

4    Cir. 2006), where the Court rejected the defendants' contentions outright.  In that case, the

5    defendant argued that because it registered the "Glenn Miller Orchestra" mark and the mark was

6    incontestable, it had rights to the mark paramount to plaintiff.  But the argument "misapprehended"

7    a fundamental principle of trademark law.  "Registration does not create a mark or confer

8    ownership; only use in the marketplace can establish a mark.  *Cal. Cooler, Inc. v. Loretto Winery,*

9    *Ltd*., 774 F.2d 1451, 1454 (9th Cir.1985), noting that "[A] trademark is a common law property

10   right that exists independently of statutory provisions for registration."  (internal quotation marks

11   omitted); 3 McCarthy on Trademarks and Unfair Competition §19:3, at 19–15 to –16 (4th ed.

12   2005).  Neither the registration nor the incontestable status of the "Glenn Miller Orchestra" mark

13   affects Appellants'[plaintiffs'] ownership of the "Glenn Miller" mark, which (a jury could find) was

14   acquired through use in the marketplace."  Citing to 15 U.S.C. §1065, the court held that the

15   defendant's registered mark did not foreclose the appellants/plaintiffs from establishing that

16   defendants infringed upon their rights to their mark.

17         "Incontestability" is no defense against a prior user's trademark rights for infringement.

18   Further, incontestability is no defense to claims of functionality, fraud or generic-ness,

19   abandonment or misleading use as to source (15 U.S.C.§1064(3).)  "Incontestable" marks are

20   subject to the provisions of 15 U.S.C §1065.  *Butkus v. Downtown Athletic Club of Orlando, Inc.,*

21   2008 WL 2557427, at *6 (C.D. Cal. 2008); *Marshak v. Treadwell*, 240 F.3d 184, 198 n. 10 (3d Cir.

22   2001) ("Even if a junior user's mark has attained incontestable status, such status does not cut off

23   the rights of a senior user."); *Spiral Direct, Inc. v. Basic Sports Apparel, Inc.*, 151 F.Supp. 3d 1268,

24   1275 (M.D. Florida 2015); *Sovereign Military Hospitaller Order v. Florida Priory of the Knights*

25   *Hospitallers*, 809 F.3d 1171, 1185 (11th Cir. 2015).

26         The single case cited by defendant is inapplicable to the issue of a defense to a prior user

27   plaintiff.  *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 199 (1985).

28   "Incontestability" is a statutory notion relating to the foreclosure of claims on the basis of a lack of

secondary meaning.  In *Park 'N Fly*, the Supreme Court dealt with the incontestability issue regarding a challenge against the registrant that its mark was merely descriptive.  It held that a registrant could assert incontestability in enforcement, as well as in defense.  "Incontestability" does not foreclose a myriad of challenges to the registered mark or quiet title in a mark where rights to challenge the registration remain.  *Id*. at 197-198.

Here, TWiT's rights have priority over Twitter.  Its priority has always been recognized, undisputed, between the parties.  As described in its Complaint, TWiT's first use in commerce of the mark at issue began in 2005. (Complaint, ¶7.)  In addition to whatever federal registration rights TWiT owns, its common law rights under California law began at that time.  Twitter's use started later, in 2006, according to the registration cited in its briefing.  TWiT's application for registration of the mark preceded Twitter's application, as did the registration itself.  Under these circumstances, the issue of "incontestability" is not dispositive.

2.    Twitter's Registration Does Not Cover the Use At Issue.

Notwithstanding the "incontestability" analysis, Twitter's registration has nothing to do with the premise of this litigation.  Twitter's registration claims uses that are not at issue; it is based on Twitter "providing an online community forum for registered users to share information, photos, audio and video content about themselves . . . ."  Request For Judicial Notice, Ex. 2; emphasis added.

Whatever rights Twitter may have via its registration for providing a forum for its registered users to share personal information about themselves, Twitter has no registered or unregistered rights to use the mark as a platform for Twitter itself, under Twitter's name, to present its own original programming or to sponsor programming by registered users under the Twitter name.  That is what Twitter is now doing.  The case is not about cat videos posted by third party users.  Twitter itself, under its own name, is acting beyond the scope of its registration and infringing on TWiT's rights.  Twitter began this incursion shortly before the Complaint was filed; the "incontestable" registration and statutes of limitation arguments are red herrings.

1       3.      The Statue Of Limitation/Laches Arguments Fails

2              For same reasons as set forth above, Twitter's attempt to defeat the trademark claims

3       on the basis of the statute of limitations must fail.  These claims accrued well within the statutory

4       period cited by Twitter, even assuming that there is a statute of limitations applicable to the

5       trademark claims.  Moreover, any argument pertaining to the doctrine of laches is misplaced.  The

6       claims brought by TWiT arose in 2017, when Twitter began using its mark for uses other than for

7       its third party patrons posting their own videos "about themselves."  They arose when Twitter, in

8       the words of the Complaint, expanded its use of its mark, beyond the scope of its registration, to

9       include streaming and downloading of audio/video content under the Twitter brand, rather than

10      facilitation of individual users posting to their own Twitter feeds on the platform.  This expanded

11      use was first discovered in 2017, and the trademark claims are timely.

12                                      III. Conclusion

13             Twitter has made an effort to defeat TWiT's claims *ab initio*, before discovery has begun

14      and the picture at bench "colored in".  But the effort is misplaced, relying in large part on additional

15      "facts" brought to Court that are actually irrelevant.  A plausible reading of the interactions between

16      TWiT and Twitter and the conduct undertaken by each precludes dismissal of this case.  TWiT

17      respectfully requests that this Court deny the Motion to Dismiss.

18

19      Dated:  April 17, 2018                    SPAULDING, McCULLOUGH & TANSIL, LLP

20

21      By____/ S/ Karin P. Beam_____
                Karin P. Beam

22              Attorneys for Plaintiffs
                TWiT, LLC and Leo Laporte

23

24

25

26

27

28

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that a true and correct copy of the foregoing document was filed with the

3   Court and electronically served through the CM-ECF system which will send a notification of such

4   filing to all counsel of record.

5   Dated: April 17, 2018

6                                              Teresa Ramirez

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28