UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TWIT, LLC, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> TWITTER INC., <br><br> Defendant. | Case No.18-cv-00341-JSC <br><br> **ORDER RE: MOTION TO DISMISS** <br><br> Re: Dkt. No. 17 |

Plaintiffs TWiT, LLC, and its founder, Leo Laporte bring this civil action against Twitter, Inc. alleging breach of contract and tort claims, as well as trademark infringement claims under the common law and the Lanham Act, 15 U.S.C. §§ 1114, 1125. Twitter has moved to dismiss Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and as barred by the applicable statute of limitation. (Dkt. No. 17.) Having considered the parties' briefs and having had the benefit of oral argument on May 24, 2018, the Court GRANTS the motion to dismiss.[1] Plaintiffs have not plausibly alleged that they entered into a contract with Twitter, that Twitter defrauded Plaintiffs, or that Twitter is doing something that infringes on Plaintiffs' trademarks.

## BACKGROUND

### A. Complaint Allegations

Since 2005 TWiT has distributed audio and video content over the internet in the form of hosted programs covering a broad range of topics. (Dkt. No. 1 at ¶ 7.) These programs are distributed to the public by TWiT via downloading or streaming from the internet ("netcasts").

---

[1] Both parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 7 & 13.)

(*Id*. at ¶ 7.) In addition to streaming live content, the TWiT website retains archives of its shows dating back numerous years which are available for download. (*Id*. at ¶ 8.)

This audio and video content is provided under the TWIT trademark. Leo Laporte is the owner of the TWIT trademark and TWiT is the exclusive licensee. (*Id*. at ¶ 9.) The TWIT mark is registered on the U.S. Principal Register for use in connection with entertainment in the nature of visual and audio performances, and musical, variety, news and comedy shows (Registration No. 3,217,759). (*Id*. at ¶ 10.) The application for this registration was filed on May 15, 2006 and the Registration issued on March 13, 2007. (*Id*; Dkt. No. 1-1.) Since 2005, Plaintiffs have extensively advertised and promoted the TWIT mark, and invested substantial time, energy and resources to develop substantial consumer recognition of the mark. (Complaint at ¶ 11.)

On March 6, 2007, Evan Williams, one of the co-founders of Twitter, appeared on TWiT's "net@night" program. (*Id*. at ¶ 12.) Mr. Laporte co-hosted the show. (*Id*.) Williams described Twitter as a text-based microblogging service. (*Id*. at ¶ 13) He "acknowledged that Twitter was aware of the conflict between their TWITTER brand and Plaintiffs' TWiT mark when they adopted TWITTER as their mark." (*Id*. at ¶ 13.) Williams also "acknowledged the confusion which likely would arise from the use of TWITTER in the marketplace, as well as instances of actual confusion which already had arisen." (*Id*.) Given this, Williams and Laporte, "on behalf of Twitter and TWiT, recognized and agreed to a basis for coexistence of the two marks, conditioned on each company continuing its own unique distribution platform." (*Id*. at ¶ 14.)

This "coexistence agreement" was honored by both TWiT and Twitter for years. (*Id*.) However, in 2009, news stories were published indicating that "Twitter was planning to expand its services to distribute video content under the TWITTER brand, contrary to the coexistence agreement." (*Id.* at ¶ 15.) TWiT and Laporte were greatly concerned that this potential business model expansion would have a significant effect on TWiT's business. On June 4, 2009, Laporte sent a letter to Williams (who was then Twitter's CEO) to express his concern about Twitter's expansion beyond microblogging and into audio-video streaming. (*Id.* at ¶ 16; Dkt. No. 1-2.) The next day, Williams responded via email "[c]onsistent with the coexistence agreement" and advised Laporte that the news reports were not accurate. (Dkt. No. 1 at ¶ 17.) Williams responded:

2

"Don't worry: We're not expanding to audio or video under the Twitter brand." (*Id*.; Dkt. No. 1-3.)

In reliance on this renewed promise and representation by Twitter regarding coexistence in separate business models, Laporte and TWiT continued forward with the use of the TWiT mark, and did not take steps otherwise available to protect their rights. (*Id*. at ¶ 18.) However, in May 2017, TWiT and Laporte became aware of Twitter's current plans to expand its use of the TWITTER mark in connection with the streaming and downloading of video content over the internet. (*Id*. at ¶ 19.) Twitter's use of the TWITER mark with these new products and services breaches its promise and agreement with TWiT and Laporte and creates a likelihood of confusion with the TWIT mark. (*Id.* at ¶ 20.)

**B. Procedural Background**

Plaintiffs TWiT and Laporte filed this action in January 2018, six months after sending a cease and desist letter to Twitter. (*Id.* at ¶ 21.) Plaintiffs allege 12 claims for relief: (1) breach of written contract; (2) breach of oral agreement; (3) breach of implied contract; (4) promissory estoppel; (5) false promise; (6) negligent misrepresentation; (7) intentional interference with prospective economic advantage; (8) intentional misrepresentation; (9) negligent interference with prospective economic advantage; (10) trademark infringement, in violation of the Lanham Act, 15 U.S.C. § 1114(1)(a); (11) unfair competition, in violation of the Lanham Act, 15 U.S.C. § 1125(a); and (12) common law trademark infringement.

Twitter responded by filing the now pending motion to dismiss. (Dkt. No. 17.) Shortly after Twitter filed the motion to dismiss, Plaintiffs filed a motion to disqualify Durie Tangri LLP and its attorneys as counsel for Defendant Twitter. (Dkt. No. 25.) Both motions are fully briefed and came before the Court for hearing on May 24, 2018.

**JURISDICTION**

In federal court, subject matter jurisdiction may arise from either "federal question jurisdiction" or "diversity of citizenship" when the amount in controversy exceeds $75,000. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). To properly allege diversity jurisdiction, a plaintiff must claim damages in excess of $75,000 and each defendant must be a citizen of a

3

different state from each plaintiff. *See* 28 U.S.C. § 1332; *Diaz v. Davis (In re Digimarc Corp. Derivative Litig.)*, 549 F.3d 1223, 1234 (9th Cir. 2008). Here, as all parties are residents of California, there is no diversity jurisdiction. However, the Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs plead trademark infringement and unfair competition claims under the Lanham Act.

## DISCUSSION

Plaintiffs' claims fall within four general categories: contract, tort, fraud, and the Lanham Act. Twitter insists that Plaintiffs have failed to plead facts suggesting entitlement to relief under any category of claims. Twitter also contends that the claims are all barred by the applicable statute of limitations.

**A.    Plaintiffs' Contract Claims**

Plaintiffs allege four contract-related claims: (1) breach of written contract; (2) breach of oral agreement; (3) breach of implied contract, and (4) an alternative promissory estoppel claim. Twitter contends that each of these claims fails because Plaintiffs have not pled any of the required elements of a contract or an enforceable promise. The Court agrees.

The essential elements of a contract under California law are "(1) '[p]arties capable of contracting;' (2) '[t]heir consent;' (3) '[a] lawful object;' and (4) '[s]ufficient cause or consideration.'" *U.S. ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 462 (9th Cir. 1999) (alterations in original) (quoting Cal. Civ. Code § 1550). "Contract formation requires mutual consent, which cannot exist unless the parties agree on the same thing in the same sense." *Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 208 (2006) (quotations omitted); *see also Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 315 (9th Cir. 1996) ("[p]arties must communicate their mutual consent to enter into a contract.").

**1.    Oral contract claim**

Plaintiffs allege that during Williams' March 2007 discussion on TWiT's net@night program Williams and Laporte, on behalf of Twitter and TWiT, agreed that "Twitter would not distribute video or audio content and TWiT would not be a microblogging service." (Dkt. No. 1 at ¶ 31.)

Twitter has submitted the complete audio of Williams' March 2007 TWiT discussion. As the complaint references this discussion (indeed, the oral contract claim is based on the discussion), and Plaintiffs do not dispute the audio's authenticity, the Court may review and has reviewed the audio. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may ... consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment."). Nothing in the audio suggests that a contract was formed. No offer was made. No offer was accepted. No consideration was exchanged. As Plaintiffs rely entirely on the March 2007 discussion as the basis for the oral contract claim, they must be able to point to something in the exchange that plausibly supports an inference that a contract was formed. They have not done so.

The 2009 letter from Mr. Laporte which forms the basis for Plaintiffs' written contract claim highlights the implausibility of the oral contract claim. Plaintiffs allege that "news stories were published in 2009 indicating that TWITTER was planning to expand its services to distribute video content under the Twitter brand "contrary to the coexistence agreement." (Dkt. No. 1 at ¶ 15; Dkt. No. 1-2.) Laporte therefore sent correspondence to Williams "to express his concern about Twitter's expansion beyond microblogging and into audio/video streaming services." (*Id*. at ¶ 16; Dkt. No. 1-2.) Laporte's letter references the "recent news stories" and TWiT's efforts to build up its mark; he concludes: "[c]learly, the use of the TWITTER mark for audio or video streaming is problematic for TWiT and we don't want to have to use any formal legal means to protect our mark. I am open to any creative solutions that you may have to this problem but any solution needs to be respectful of our trademark rights." (Dkt. No. 1-2 at 2.) Although Plaintiffs insist that at the time Laporte wrote this letter they had an enforceable oral agreement with Twitter in which Twitter promised not to offer video content under the Twitter brand, Mr. Laporte's letter does not even hint that such an agreement exists. Plaintiffs have not pled facts that state a plausible oral contract claim. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Plaintiffs nonetheless urge that because Twitter did not offer audio or video under the Twitter brand until 2017, such conduct plausibly supports an inference that a contract not to offer

1  such services was formed.  Not so.  Twitter's decision not to provide audio or video content under
2  the Twitter brand until 2017 cannot retroactively make the March 2007 TWiT discussion create a
3  contract when there are no words in that discussion that can reasonably be construed as an offer
4  and acceptance of particular terms and identification of consideration.

5  **2.  The Written Contract Claim**

6  The written contract claim is implausible as well.  It is based upon the 2009 letter and Mr.
7  Williams' email response the following day:



TWiT, LLC
Box 1018 • Petaluma, CA 94953-1018 • http://twit.tv • 800.605.TWiT

June 4, 2009

Ev Williams
CEO
Twitter, Inc.
539 Bryant St. Suite 402
San Francisco, CA 94107

Dear Ev,

It's amazing that it has been only two years since you joined me and Amber on net@night 15 to talk about Twitter.  I am excited for your success as Twitter has grown in popularity and there is increasing awareness and use of your technology.  However, the growth of Twitter brings us back to one of the things we talked about back in early 2007 - the similarity of the TWIT and TWITTER marks.

Although the TWITTER trademark is obviously very close to TWIT, we thought we could coexist because of the difference between our two businesses at that time.  Twitter is a micro-blogging technology, while TWiT's focus is on streaming audio and video content.  For the most part, it seems to have worked so far.

Unfortunately, recent news stories indicate that Twitter could be planning to expand its services beyond that important boundary.  Although not entirely clear, it appears that Twitter might start providing video content under the TWITTER brand.  If Twitter should proceed with doing that, it would do so to the great detriment of TWiT.

Since early 2005 we've spent an extraordinary amount of time, energy and resources building TWIT into a well recognized brand.  Our audio podcasts regularly have more than two million downloads per month.  Our video streams are hitting over a half million people a month.  We care about this brand.  Additionally, the mark has been registered with the Trademark Office since 2007.

By expanding into audio or video content, Twitter would be treading on these hard-earned trademark rights, which you'd be doing so in more than one way.  You would be causing confusion among those familiar with the TWIT mark.  And for another large segment of the Internet community, the TWITTER brand would simply overrun the TWIT mark and people would improperly conclude that TWiT is associated with Twitter.  To use legalese, this is both forward confusion and reverse confusion.

Our relationship started collegially and I would like to maintain that collegial relationship.  But at this point I think it is critical that we discuss the boundaries between our respective uses of TWITTER and TWIT.  Clearly, the use of the TWITTER mark for audio or

Page 2

video streaming is problematic for TWiT and we don't want to have to use any formal legal means to protect our mark.  I am open to any creative solutions that you may have to this problem but any solution needs to be respectful of our trademark rights.

You can reach me on my cell phone at (707) 981-4602 or send me an email at leo@leoville.com.  I look forward to hearing from you and continuing our conversation.

Very truly yours,

Leo Laporte

cc: Warren L. Dranit, Esq.

1  (Dkt. No. 1-2.)

2  ----- Original message -----
   From: "Evan Williams" <ev@twitter.com>
3  To: "Leo Laporte" <leo@leoville.com>
   Date: Fri, 5 Jun 2009 10:29:35 -0700
4  Subject: tv
   Hi, Leo.
5
   Just got your letter. Don't worry: We're not expanding to audio or video under the
6  Twitter brand. That news story was the result of an over-zealous production company
   (and extremely sloppy reporting by AP). See our
7  post: http://blog.twitter.com/2009/05/were-not-making-tv-show.html

8  Thanks.

9  Ev.

10 --
   Leo Laporte
   Call for Help TV
11 KFI AM 640 Los Angeles
   this WEEK in TECH

12  (Complaint at ¶ 16; Dkt. No. 1-3.)  Plaintiffs contend the letter and email "confirm the essential

13 terms of a written contract between and among the parties by which Twitter agreed not to

14 distribute audio and video content under the TWITTER brand."  Further, the consideration for this

15 promise was that each party would refrain from entering into the area of the other and TWiT

16 would also not enforce "its rights through legal means." (Dkt. No. 1 ¶¶ 24-25.)

17       The letter and the email response do not plausibly support an inference that Twitter agreed

18 not to offer audio and video content under the Twitter brand in return for some unidentified

19 consideration.  At oral argument Plaintiffs focused on the words "don't worry" and "under the

20 Twitter brand" in Williams' email.  But "don't worry" does not support a plausible inference that

21 Mr. Williams promised that Twitter would *never* expand to audio or video under the Twitter

22 brand.  The "don't worry" was in response to Laporte's concern that recent news stories indicated

23 that Twitter was planning to expand into those services and, if so, TWiT might have to pursue

24 litigation. Williams responded that the news stories were wrong and that Twitter was not

25 expanding to audio or video under the Twitter brand.  Drawing all reasonable inferences from the

26 letter and email in Plaintiffs' favor, Twitter did not agree to never expand into audio and video.

27 Under Plaintiffs' theory, any time someone accuses another of engaging in trademark

28 infringement and threatens litigation, and the threatened party responds that it is not engaging in

7

1    the accused conduct, the parties have entered into a contract in which the threatened party
2    promises to never engage in the accused conduct in return for the accusing party's promise not to
3    sue. Such theory finds no support in the law of contracts.

### 3. The implied contract/promissory estoppel claim

Plaintiffs' alternative implied contract/promissory estoppel claim fails for the same reasons. The elements of a promissory estoppel claim are "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3)[the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." *US Ecology, Inc. v. State*, 129 Cal. App. 4th 887, 901 (2005) (internal citation and quotation marks omitted). The promise must be "definite enough that a court can determine the scope of the duty[,] and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages." *Garcia v. World Sav., FSB*, 183 Cal. App. 4th 1031, 1045 (2010). Plaintiffs allege that "Twitter by both express assertions and through its conduct, promised that it would forebear from providing a means for the general public to stream or download video and audio content over the internet" such that they "did not bring an action for infringement of their rights in either 2007 or 2009." (Complaint at ¶ ¶ 44-46.) Those allegations, however, are directly contradicted by the March 2007 audio and 2009 letter and email upon which they are based. *See Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295–96 (9th Cir.1998) ("[W]e are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint.") Drawing all reasonable inferences in Plaintiffs' favor, the audio of the March 2007 discussion does not plausibly suggest that Williams clearly and unambiguously promised that Twitter would never offer audio or video under the Twitter brand. Nor can the 2009 email be reasonably read as a promise to never offer audio or video content. A statement regarding Twitter's present operation does not create an enforceable promise. *See Block v. eBay, Inc*., 747 F.3d 1135, 1138 (9th Cir. 2014).

### 4. Leave to amend would be futile

Plaintiffs' first, second, third, and fourth claims for relief for breach of written contract, breach of oral agreement, breach of implied contract, and promissory estoppel are dismissed as

they are premised on the formation of a contract that is belied by the very documents/audio on which they are premised. The dismissal is without leave to amend. At oral argument the Court asked Plaintiffs what more they could allege if given leave to amend these claims given that the Court currently has before it the exact language that was exchanged between the parties and upon which Plaintiffs' claims are based. Plaintiffs only responded that Twitter's subsequent conduct, that is, its failure to offer video or audio under the TWITTER brand until 2017, supports their contract claims. But such conduct is already alleged in the complaint and has been considered by the Court. Accordingly, leave to amend would be futile.

### B.     Plaintiffs' Fraud Claims

Plaintiffs also bring three fraud-based claims: (1) false promise; (2) intentional misrepresentation; and (3) negligent misrepresentation. All of these claims fail as well.

Fraud requires "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or scienter); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Small v. Fritz Companies Inc.*, 30 Cal.4th 167, 173 (2003). The elements for intentional misrepresentation are (1) a misrepresentation, (2) knowledge of falsity, (3) intent to induce reliance, (4) actual and justifiable reliance, and (5) resulting damage. *Lazar v. Superior Court*, 12 Cal.4th 631, 638 (1996). A promissory fraud (false promises) claim requires: "(1) a promise made regarding a material fact without any intention of performing it; (2) the existence of the intent not to perform at the time the promise was made; (3) intent to deceive or induce the promisee to enter into a transaction; (4) reasonable reliance by the promisee; (5) nonperformance by the party making the promise; and (6) resulting damage to the promise[e]." *Rossberg v. Bank of Am., N.A.*, 219 Cal. App. 4th 1481, 1498 (2013), as modified on denial of reh'g (Sept. 26, 2013). Each of these claims are subject to Federal Rule of Civil Procedure 9(b)'s requirement that "[i]n averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." That is, "[e]ach element of a fraud count must be pleaded with particularity so as to apprise the defendant of the specific grounds for the charge and enable the court to determine whether there is any basis for the cause of action." *Chapman v. Skype Inc.*, 220 Cal.App.4th 217, 231 (2013).

As the fraud claims (like the contract claims), are based on the March 2007 discussion and the 2009 letter and email, and as it is not reasonable to infer from the audio or the letter and email that Williams promised that Twitter would never officer video or audio content under the Twitter brand, Plaintiffs have failed to plead any misrepresentation or promise. Further, to the extent that Plaintiffs' fraud claims are based on Williams' 2009 email saying "Don't worry: We're not expanding to audio or video under the Twitter brand," Plaintiffs have failed to allege how or why this statement was false or misleading. To the contrary, at oral argument Plaintiffs conceded that they have no basis to allege that the statement was false when made. According to Plaintiffs, Twitter did not expand into audio or video in 2009, 2010, 2011, 2012, 2013, 2014, 2015, and 2016. Thus, based on Plaintiffs' own allegations, the statement was true.

Accordingly, Plaintiffs' fifth, sixth, and eighth claims for relief for false promises, negligent misrepresentation, and intentional misrepresentation, respectively, are dismissed. As amendment would be futile for the same reasons as the contract claims, the dismissal is without leave to amend.

### C.  **Plaintiffs' Tort Claims**

Plaintiffs also plead claims for intentional interference with prospective economic advantage and negligent interference with prospective economic advantage.

The elements of a claim for tortious interference with prospective economic advantage are: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003). A negligent and tortious interference claim have essentially the same elements, except in the former, the plaintiff must prove that the defendant engaged in negligent as opposed to intentional conduct. *See N. Am. Chem. Co. v. Superior Court*, 59 Cal. App. 4th 764, 786 (1997).

Plaintiffs allege that "since establishing its business Plaintiffs have gained and maintained valuable economic relationships with both consumers of its content and businesses who advertise

on, or in connection with, Plaintiffs' programs" and that Twitter "was or reasonably should have been aware of these relationships" and intentionally or negligently "expand[ed] its platform and services to include distribution of video content" and "disrupt[] Plaintiffs' relationships with both consumers and advertisers alike." (Complaint at ¶¶ 64-66, 78-80.) To the extent that these claims are predicated on Plaintiffs' contract clams, they fail for the same reasons stated above. Even if based on separate allegations—for example, trademark infringement— Plaintiffs' allegations are insufficient because they simply parrot the elements of the claim. *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("[A]llegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively.") Plaintiffs have not pled facts that state a plausible claim for intentional or negligent interference.

Accordingly, Plaintiffs' seventh and ninth claims for relief for intentional and negligent interference with prospective economic advantage, respectively, are dismissed for failure to state a claim. The dismissal will be leave to amend given Plaintiffs' representation at oral argument that they can plead facts to support their claims.

### D. Plaintiffs' Lanham Act and Common Law Trademark Claims

Plaintiffs plead two claims for relief under the Lanham Act: (1) trademark infringement, in violation of the Lanham Act, 15 U.S.C. § 1114(1)(a), and (2) unfair competition, in violation of the Lanham Act, 15 U.S.C. § 1125(a). They also make a common law trademark claim.

A claim of trademark infringement under § 1114(1)(a) of the Lanham Act requires a trademark holder to demonstrate: (1) ownership of a valid mark (i.e., a protectable interest), and (2) that the alleged infringer's use of the mark "'is likely to cause confusion, or to cause mistake, or to deceive'" consumers. *KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005) (quoting 15 U.S.C. § 1114(1)(a)), on remand from 543 U.S. 111 (2004). Twitter does not dispute that Plaintiffs own a valid mark; rather, it contends that the Twitter mark is incontestable such that there can be no claim of infringement.

Under the Lanham Act, a trademark registration becomes incontestable if and when the mark has been in continuous use for five years after the initial registration, there has been no final

11

decision adverse to the registrant's claim of ownership of the mark, there is no pleading challenge to the validity of the mark, and the registrant files an affidavit with the Commissioner of Patents within one year after the expiration of the initial five-year period, affirming the mark is still in use. 15 U.S.C. § 1065. Registration with the USPTO "constitute[s] 'prima facie evidence' of the validity of the registered mark and of the registrant's exclusive right to use the mark on the goods and services specified in the registration." *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1390 (9th Cir. 1993) (quoting 15 U.S.C. § 1115(a)). Twitter thus seeks judicial notice of its May 12, 2009 trademark registration. (Dkt. No. 18-2.)

As discussed at oral argument, Plaintiffs' Complaint does not sufficiently identify Twitter's allegedly infringing conduct. For this reason alone the trademark claims must be dismissed. Plaintiffs have not sufficiently pled a likelihood of confusion given that they have not adequately pled what Twitter is doing that is allegedly creating that confusion. Further, unless and until Plaintiffs sufficiently allege infringing conduct, the Court cannot determine whether the incontestability presumption applies. Accordingly, the Lanham Act and common law trademark claims are dismissed with leave to amend.

### E.     The Statute of Limitations

For the reasons stated at oral argument, Twitter's motion to dismiss on statute of limitations grounds is denied without prejudice.

### CONCLUSION

The contract and fraud claims are premised on the March 2007 TWiT discussion and the 2009 letter and email. As there is no dispute as to the contents of the discussion or the letter and email, and as the discussion, letter and email, considered separately or together, do not support a plausible inference that Twitter agreed to never offer audio or video content under the Twitter brand, Twitter's motion to dismiss the contract and fraud claims is GRANTED without leave to amend. Twitter's motion to dismiss the remaining claims is GRANTED with leave to amend to allege facts to support those claims. Any amended complaint must be filed within 20 days of the date of this Order.

The Initial Case Management Conference is reset for August 2, 2018 at 1:30 p.m. in

1 Courtroom F, 450 Golden Gate Ave., San Francisco, California.  A Joint Case Management
2 Conference Statement is due July 26, 2018.
3   This Order disposes of Docket No. 17.
4   **IT IS SO ORDERED.**
5 Dated: May 30, 2018

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge